We'll call our next case, which is the Secretary of Labor v. James Doyle and Cynthia Holloway. I understand the parties are splitting their argument in time. Mr. Ludwig? Yes, Your Honor. You've got ten minutes. Are you reserving any time? Yes, Your Honor. I would like to request two minutes for rebuttal. Okay. Done. May it please the Court, my name is Stephen Ludwig and I represent Cynthia Holloway. Cynthia Holloway had a professional employee organization, which actually started in 1989, named Employers Depot. In 2000, she learns about the Pitwo Union from an insurance broker. She confirms that it is a bonafide union filing LM2s with the federal government, receives assurances, and establishes... In 2002, when this Court remanded this case, it recognized that she was not a principal architect of what the Court referred to as the PCMG scheme, and directed the trial court to answer the specific question of what was her awareness and liability for the consequences. And on the remand, the trial court took no additional testimony, and in fact, on that question, made no additional factual findings. When you say they made no additional factual findings, once the Court had decided that the check two funds were planned assets, and it looked at the letters from the several state insurance commissioners, didn't it make a finding, indeed a finding of fact, that she was aware of these things, or certainly should have been aware of these things, and in that respect was clearly in breach? Well, the record is murky in terms of what her awareness was, and certainly there is a reference to, at the time, and as this Court recognized in its opinion, and we can't look at this in hindsight, there are cease and desist orders that are issued in 2003 and 2007, that would all be hindsight. At the time, there are, and what's in the record, there are two matters. One is an application for a cease and desist order, and the other is a cease and desist order that is issued in June of 2002. And is there a cease and desist order, the Oklahoma one, back much earlier than that, like in April? No, Your Honor, there's actually a January 2002 application for a cease and desist order, and there's no record of whether Ms. Holloway saw that. I mean, certainly she references having some knowledge of other investigations going on. But other than the cease and desist orders, you have at a minimum an April 2002 meeting that the District Court highlights as one in which the third-party administrator tells her there are problems with the processing of these things. There's an early May 2002 meeting, there's a later May 2002 meeting, there's the meeting at the beginning of September, and by that point, they're on their, what, their fourth third-party administrator? I mean, those things are facts that are percolating along and seem to be underpinning the District Court's statement that Holloway knew or should have known the facts upon which the circuit based its conclusion that the CBAs were not the result of bona fide collective bargaining and that several states had negatively, had issued cease and desist letters and that she had mismanaged and ignored evidence. Those are, those, they look like findings of fact based on the record that had been developed. How are they clearly, we have to look at those as clearly erroneous, through the clearly erroneous lens, right?  Okay, given the record, how would we say that that's clearly erroneous? Well, there are, there are, we suggest that there are no factual findings on her awareness of the Check 2 money and her awareness that there's any other, any, of what PCMG is doing. Because from the perspective of the fund and the trustee, the fund establishes the contribution rates, the trustees establish the contribution rates. In fact, in May, they increased the, the trustees meet and they increased the contribution rates, effective, I think, a month or two later. What's known in April, the April 23rd meeting, which is just with a claims administrator, is there are some issues here. There's a direction. Let's get this information together. Let's come up with a plan. And then, and then in May, there's a, there's a six-hour trustee meeting. And that meeting is with the fund's attorney, the actuary, the claims administrator, the accountant, with extensive, there are minutes, I mean, I think there are draft minutes from Mr. Goldstein, but goes through as a plan of action. What, what is this fund going to do to make sure that its government filings are secured? I mean, to suggest she should race into court at that point is, is not, is not borne out by what she knew at that time. Since you've got just a couple minutes left, and I want to call you some other questions about the facts, let me ask you to focus on a legal point. You seem to be making the argument, if I understand it correctly, that in order to understand what plan assets are, we have to look from the top down. We have to say, say that the regulation speaks in terms of what the, what the trustee knew, what the people at the top knew. When you cite an opinion letter from the Department of Labor, the Thomas Veal opinion letter, the language that you cite is, quote, whether a plan acquires a beneficial interest in definable assets depends largely on whether the plan sponsor expresses an intent to grant such a beneficial interest. I think I've understood your argument, right? Correct? Yes, sir. Okay. The same sentence after the word or says, or has acted or made representations sufficient to lead participants and beneficiaries of plan to reasonably believe that such funds separately secure promised benefits or otherwise plan assets. So by the very opinion that you advance, and in the same sentence as the one that you quote in part, hasn't the position from the Secretary of Labor been that it's not just top down, but you have to also consider bottom up what the people reasonably understood the participants and beneficiaries based on representations made to them? Well, we disagree with the bottom up because if you look at ERISA, it talks about the declaration of trust and the collective barring agreements. If you look at what the trustees are doing, they are establishing the amount of contributions, the check one monies. So all those monies are coming in. So the only thing that Cynthia Holloway knows is those monies are coming into the fund. Let's take it away from Holloway for just a moment and just answer this in the abstract. Is the logical end of your position that a trustee can insulate himself or herself from knowledge about what's going on outside by establishing trust documents or plan documents that say these are the plan assets and then say, I don't want to know what you're telling people out there. I'm just living with these documents. Is that how the law operates? And if it does, how can that be consistent with ERISA's purpose of being a remedial statute? Well, it's certainly not a vacuum. But in this instance, on these facts, when all the contributions are coming in, and there are, I think, over $7 million of contributions that come in as check one, and a trustee only knows about that should be the funds coming in, and then that leads to the issue of what should she have done had she acted? Does that cause any, assuming the court finds there are plan assets and affirms that, did anything she did lead to a loss of plan assets to the fund based on what she knew at the time? So when you say what she knew at the time, are you frozen in time, or can't you ascribe a greater knowledge to her as more and more contributions come in and as the beneficial interest that the fund has is clearly established and then the amount of money increases? Does the state of her knowledge not change at any point? Well, it is incremental. When Cynthia initially says there may be some issues, she acts appropriately, directs it, they meet with the trustees, they meet with the professionals. And then when she learned, because this is only really a five-month window, from April when she first learned, April 23rd, to her resignation on September 27th of 2002, the issue is not what could she have done, it's did she act reasonably based on what she knew? And the reasonable action that she took was to alert her co-trustees, because she was a trustee, she wasn't the trustee, she wasn't the only trustee, there was another employer trustee, and the employer and union trustee, as long as they agreed, could act. Was it appropriate for her to articulate her concerns and to resign, albeit continuing on to make sure claims are paid, putting up her own contributions, to assist in the fund continuing to pay the Check One monies, which is the only thing she knew about? Can I just ask one question? Your briefing seems to emphasize that the district court erred in concluding that the CBAs were bogus. Yes. And if the district court didn't err in that respect, do you lose? No, because you still have the only, the trust, the Holloway had no knowledge, and no way to know frankly, of this PCMA and what they were doing as a separate marketing entity, because the trust never received those funds and never had any knowledge of those funds, because it was receiving the Check One monies, which were for the health and welfare benefits. A PEO provides other benefits, payroll, and this is in theory. In theory. Well, I think the record shows they put a gap, but that's not something that she knew. Well, I mean, there was testimony here from Monastero and Morgan that said, no, these funds that we were paying were for health insurance, period. Well, certainly there were some people who were doing that, and they made the contributions. So if the records are critical on that, doesn't the trial judge have a right to say, I find, you know, Monastero and, I mean, or we, even if, I know the district court didn't explicitly do this, but, you know, we can affirm for any reason. How do you get around the record evidence that suggests that, again, I know you don't accept the bottom-up theory, but there is plenty of record evidence that suggests that the payments that were made were thought to be for health insurance, not for the ancillary services you just mentioned. There is some evidence on the record. Yes, Your Honor. Okay. Okay. Thank you, Mr. Levin. Thank you. Ms. Goulden. Am I saying your name right, ma'am? Good morning, Your Honor. We have another person here. I'm sorry. We're going to let Mr. Doyle's counsel have a shot at this. Thank you. Am I saying your name right? Is it Ms. Goulden? Goulden, yes, Your Honor. Thanks. Good morning, Your Honors. Jill Goulden on behalf of Appellant James Doyle. The issue with respect to Mr. Doyle in this case is whether he exercised control over fund assets sufficient to create a fiduciary status for him. Right. As the record reflected, Mr. Doyle was the owner of PCMG, which marketed the PEO services of PCINP, not just the fund. The fund was one of the services offered access to the fund. There were other services that he marketed. He may have marketed other services, and the record gives us one party, right? Mr. Brown, who said, I was going to get some administrative services, but I didn't get them, so I canceled that. I mean, is there anything else in the record? The district court explicitly looks at that and brushes it aside and says, no, what was consistently done was they were offering this as health and welfare. Consistently, most of the employers enrolled in the health and welfare. There was other employers who enrolled in GAP insurance, which was another service that was marketed. $30,000 worth, right? Out of this, what, over $7 million that we're talking about? Right. But they were marketed. The consultants that PCMG retained to go market the services of the PEO, they marketed everything that was available. And it's set forth in some of those enrollment forms that the client employer would recognize there are this, that, and the other that are available. The record does show that most of them did opt for health and welfare fund benefits, yes. So a question for you. Given that the evidence is, and tell me if you disagree with this, that $755,000 in Check One monies were unaccounted for at PCMG, how is it that Mr. Doyle wouldn't have had discretion and control over those Check One monies? Well, Your Honor, I disagree with the district court's conclusion that they were unaccounted for. As the record established at trial, all the required contributions to the fund were forwarded to the fund. As this court noted, that discrepancy had to be addressed on remand. It was not addressed neither by the secretary nor the court nor Mr. Doyle. Rather, the court just adopted the secretary's blanket statement that when you look at the money coming in and the money sent out, hey, there's this amount that's left over and so it must be with PCMG. There's no cite to any of the summary charts that were presented for the amounts. Well, then what other conclusion might one come to other than that? I think that it may disregard the fact that the testimony established that when Mr. Doyle, when the clients enrolled, they did submit one check. And of that check, PCMG then forwarded the required contribution funds, everything that was set forth by PCIMP, the union dues and the other monies that were required to be sent over. And he retained PCMG's amount, which, as we know, was subsequently then check two. So it may account for that. But there is no contrary evidence in the record. And in fact, the secretary didn't even question him. She went through the three tranches of monies. She went through the 4.5 that came in from employers. She went through the 3.1 that was forwarded to PCIMP. And she went through the 6.45 that was forwarded directly to claims administrators at the instruction of the third-party administrator. She never even questioned about where is this 7.55? Where did it go? Could it have been from the initial single check and you retained your portion before forwarding? And there's no record evidence of that. How are we to find the district court's finding with regard to the $755,000 is clearly erroneous. Well, because it disregards the evidence that all the required contributions were forwarded. Everything that Mr. Doyle or PCMG was required. If that's so, then they should be accounted for in any reconciliation with the fund, right? Maybe. I didn't see them when I was looking at the summary charts. It certainly wasn't questioned with respect to the charts that were provided and testified to by a summary witness who also didn't prepare the charts and didn't review the underlying documents that Mr. PCMG submitted. Even if we were to accept your argument and ignored the $750,000 that's in the ether somewhere, what of the secretary's argument that Mr. Doyle clearly had apparent authority and that the fund ratified his actions and that under those circumstances he was a fiduciary, that he brought millions of dollars into the fund. He marketed this. He sent on $2.7 million of the funds to claim administrators. He submitted enrollment forms that were sent both to the claim administrators and to PITWU. Those are things in the record that I take it are being pointed to and accepted by the district court as evidence that Mr. Doyle was operating. He was the face of this to the employers. What's wrong with that argument? Mr. Doyle, while he marketed the services of the PEO and collected the monies to be then forwarded to the plan, he had no relationship either with the fund or with the employers. That may be an argument that he didn't have actual authority, but that's not answering the question I'm trying to put to you in the short little over time here. The little time we've got about apparent authority, do you have some rebuttal to their assertion that Mr. Doyle, the evidence supports the assertion that Mr. Doyle had apparent authority and that all by itself, you can add ratification onto it if you want, shows he's liable as a fiduciary, he was a fiduciary. What's your response to that argument? Whether he had the authority to collect funds can't equate to a fiduciary duty to disperse the funds or to direct where the funds went. Everything that Mr. Doyle directed with respect to those funds was contractually obligated either by the fund or by PCIMP and not him. So even assuming he had the authority, an apparent authority to do it, I know he didn't have direct authority, couldn't cover those funds, the district court erred by saying, I mean it made this, the district court made this blanket statement that he directed where the funds went and he didn't. He did what he was contractually obligated to do, bless you, Your Honor, and sent the funds where they needed to go and he didn't have any authority over those funds. All right. Thank you. Anything else?  Thank you very much, Ms. Golden. Okay. Ms. Bove, now. Good morning, Your Honors. Good morning. I jumped the gun there. My name is Marcia Bove. I represent the Secretary of Labor. Ms. Bove, before we get into the many legal issues, can I just sort of ask for your view from 30,000 feet? I mean, I don't know what to call this thing except a big scam. I mean, you know, we have PITWU, it's a union, but it doesn't engage in collective bargaining and doesn't do anything. And we've got PC, you know, we've got the two PEO reps combined with these two other characters who are there criminal elements involved with these? Mr. Militello and the other gentleman whose name is Casey. Can you give us just sort of a practical overview from 30,000 feet about what we're dealing with here? I think the best overview has been made by this court in its previous opinion. The court cited – there are two places in the previous opinion, which is there at the joint appendix. The previous opinion, it's at the joint appendix at page 1275 and 1276, and then again at 1266 in footnote 23, I believe. In the body of the opinion, the legislative history, this court finds that the PCINP operation was a fraudulent device scheme to avoid the solvency controls of state regulators. And the court cites to Congress's legislative history, which was the court's own research, designed to prevent these type of schemes. And that is the best explanation. This is not a scenario that hasn't been seen before. And that's all borne out by Mr. Garnett's deposition testimony where he frankly describes – It's borne out by everything we see here. All right, but then I guess the question becomes, if we accept that, I guess we obviously accept what we wrote before, but the question then becomes can they avoid having these things called planned assets by virtue of the Check I and Check II dichotomy? Why not? Because, Your Honor, the – Is that a fair way to characterize it? Well, Mr. Doyle directed, after initially enrolling participants – I'm sorry, individual employers – he initially had them pay in one check after they were enrolled and after they reviewed the enrollment forms, which the district court properly found to be part of the governing documents here, along with the trust agreement. He then directed them to – So it's a little bit of a misnomer to say Check I, Check II, because it's one check coming from the employers, right? And then – At the time of enrollment, he asked them for one check. After they were enrolled, he then told them, Mr. Doyle, to submit two checks, one to the fund and a second to PCMG. That was his billing system. And then he diverted everything in Check II to PCMG. But what controls how plan assets are defined is the trust agreement. And the trust agreement in this case is very clear. It states that there is hereby established a trust fund into which shall be paid on or after May 1st, 2001, any and all contributions payable by employers or any other eligible employer who agreed in writing to be bound by the terms of this agreement as the individual employers did. Well, that raises the question that – about whether the collective bargaining agreement is something we can even consider as we try to understand what's going on here. You've certainly taken the emphatic position, and the district court accepted it, that – Your Honor, I'm having a little difficulty. You've taken the position, and the district court has accepted it, that the CBAs can't be considered at all. But I wonder if that is indeed the case when it seems to be understood that at least until the signals started coming in in April and the cease and desist letter came in from Louisiana in June, that from Ms. Holloway's perspective, the CBA was a controlling document, was what she was looking at, that she had a consultant counsel who confirmed to her that this was a legitimate business arrangement and that the CBA controlled the funds. How is it that from the perspective of that trustee, operating at least in those early months, the CBA is just a nullity that we shouldn't pay any attention to at all? Well, first of all, I believe the record shows that Ms. Holloway's position is she didn't know about the collective bargaining agreement that was entered into between the fund and CPINP. That's my reading of her brief and her positions below. The starting point for understanding planned assets is the trust agreement. She should have known about the trust agreement and she should have read the collective bargaining agreement. Had she done that, she would have seen that the collective bargaining agreement actually purported to modify the trust agreement because the amounts laid out, that actually was the document that... The trust agreement doesn't lay out any amounts, right? The trust agreement says what you just quoted. The collective bargaining agreement, it talks about the contributions that are going to be coming in. So as you said, that's something that from a trustee's perspective, you'd read and you'd be relying on and expecting. So why should we treat the CBAs as off limits? Can't look at that. As we're trying to assess culpability here, does that not bear any relation to the facts that we should be paying attention to? There are two points here. The starting point and the initial breach by Ms. Holloway was the failure to establish and to enforce any mechanism that would have allowed anyone running this fund to have understood what was being collected by Mr. Doyle, what he was representing to employers who he was enrolling, how that money flowed. Basically, at no time did Holloway or her co-trustees establish rudimentary financial and claims procedures that would have allowed them to identify what was coming in and what should have been coming in. That was the starting point of the breach. But very soon thereafter, as the district court found in substantial detail, reports were coming to her attention. As early as April of 2002, at least two contract administrators informed her that there were boxes of unpaid claims, some of which dated back at least six months. We could certainly say, as of April, you knew there were troubles and you should be doing something about it. Of course, the position they take is she was doing things about it. Indeed, the district court, with the evidence fresh in its mind, immediately after a bench trial looked at this evidence and said, she may not have done a great job, but you, the secretary, you didn't bear your burden of proof to show that what she did rose to the level of a breach of prudence. You haven't argued for it, and there was no finding of a breach of loyalty here. It's a breach of the duty of care on her part. So at least in the first go-round, before we sent it back for another look, the district court, in viewing this evidence, thought she didn't do a great job, but we're not going to hammer her. Now, with no further taking of evidence, there's a 180, and the district court comes out and says, not only did she breach, and not only is she liable, she's liable for every penny, for the whole time, the whole amount, even though the evidence that comes in starts talking about her having notice at the earliest April. How do you justify that based on the court's earlier finding and the lack of any intervening record being made, and the April date being the earliest you can point to and that the court identifies as a point of problem? I think the evidence was there for her to be found liable for all of the diverted. What did the district court point to on remand to say pre-April that the actions that were going on pre-April were things that she should have been on notice for and that she was in breach for duty of care? Her responsibility as a trustee was to... I'm just asking you a straightforward question about the record, Ms. Bove. What did the district court point to, if anything, pre-April? The district court pointed to the summary exhibits that showed how money flowed. It was her responsibility to inform herself of how money flowed. What this court cited in its original... Well, this court has a decision, it's a unisys, and the way you measure a fiduciary's investigation is by not just what acts the fiduciary undertook at the time it did the investigation, but by what facts the fiduciary would have found had it done an adequate investigation under the circumstances. Great, and that's the question I'm trying to press on you. What was the obligation pre-April? Pre-April, what would have put her on notice of a problem? I didn't see anything in the district court's findings. Maybe you can point me to something, but it looks like the district court starts with April 2002. Oakmont comes forward and says, we've got problems. Before that, is there anything in the record? Yes, Your Honor. What should have put her on notice was... It was her responsibility to understand how money was coming into the fund. She was aware of the fact that PCINP became an employer and brought in co-employers. It was her responsibility to know how money was coming into the fund through PCINP. She should have, from day one, when PCINP became an employer participating in the fund and designated a trustee to the board, she should have been aware of how the money was coming in. Aren't you kind of attributing an unrealistic standard that trustees have to be omniscient? Before there's reason for her to suspect a diversion of funds or a problem with claims, why isn't she, as a trustee, entitled to believe, on the advice of counsel, we have a legitimate business arrangement here and monies are going to come in and they're going to flow out and claims are going to be paid. Before she's on alert that there's a problem, how is she liable for pre-April? That's what I'm trying to get you to answer, and it's not helping me for you to say, well, she's just supposed to know. Because if the rule is she's just supposed to know, we might as well just have a rule that says all fiduciaries are liable all the time because they're supposed to know everything, and surely that cannot be the law. No, Your Honor. She needed to read the trust agreement and understand how it defined contributions. How would that have put her on notice that there were nefarious things going on with PCMG and PCINP? How would reading the trust agreement have told her that? It would have let her, she would have understood from the trust agreement that every dollar that was paid in a check by the employer, every dollar that the employer understood to be a contribution belonged to the fund. Those checks should have been written to the fund. There should have been a protocol for the check should have been paid, all of it, to the fund. But that doesn't answer the question. I'm sorry, Your Honor, I can't hear you. Oh. I'm sorry. I have a cold. No worries. I do, too. That doesn't answer the question of why there's a dichotomy, or maybe there's not, pre-April 2002 and post. What we're asking for is what is it, what fact is there pre-April 2002 that would allow us to ascribe all of the liability to her? Now, what you've just said is she should have read the trust agreement and that would have led her to know that the monies that were coming in were problematic. But how would she know that pre-April of 2002? Because there should have been a mechanism. That's what trustees do. They establish mechanisms for identifying plan assets. That is defined by the trust agreement. The collective bargaining agreement and the service agreement that Mr. Doyle had purported to modify what the trust agreement required by allowing him to remit less than the contributions he collected. It was her responsibility as a trustee to understand that that was happening. So she couldn't have relied on the counsel's advice? Well, at different times she received information from different attorneys, but none of them spoke to this point. None of them addressed how the money was flowing or what in fact was being collected by Mr. Doyle. One of them, right before she resigned, one of her justifications for resigning without appointing an appropriate trustee is that she contacted fund counsel and said bring some accountability to the fund. And his response was you should talk to the trustees about that yourself. Basically, do that yourself. But from day one, her responsibility was to establish and enforce mechanisms that would identify who is collecting these contributions. How are they defined? Who is collecting them? What are they representing? Under the trust agreement, the contributions should have been written not to anyone other than the trust. And they should have been collected by someone whose conduct she was aware of. She is the person who is responsible for locking the bank door. If you leave it open for two years, it should come as no surprise that someone steals the money. This is not a new scheme under ERISA. This is a common story, and that's what that legislative history is directed at, and that's what this court found. Isn't there something in Congress, though, about her being hit for a higher number than Doyle? Because if your theory of the case is accurate, Doyle was the thief and Holloway was the duke. Your Honor, there's a difference. All of the numbers and how the money flowed are contained in summary exhibits that all parties stipulate it to. The reason the district court's number is different is because there was other money that went astray that came in from a different individual. It was about $688,000 that came in from Mr. Weinstein's wife, right? But that kind of misses the equitable point that I think is being put to you, which is your argument made strongly in the briefs and with some passion here at the podium is this is not right. She's a fiduciary. She should have known. She ought to take it and take it hard. And yet at the same time, the person who appears from the record and from your own recounting of the record to be the wrongdoer in chief, Mr. Doyle, he's the one in the secretary's crosshairs most clearly, walks off with a lesser sanction. That just seems, how does that square with your this is wrong and inequitable pitch? Congress made trustees under Section 403 the parties who have exclusive control over plan assets. They are the first line of defense for a trust. Mr. Doyle. So the short answer is Doyle is more culpable, but a trustee has a much higher responsibility than some guy who's just running around marketing a scheme to put money in his pocket. It's a scheme that she should have discovered, and she should have discovered it from day one. That's what I was going to say. Your argument really is dependent upon the fact that Abinishio, she knew exactly what was going on, that this was a fraud from the get-go. It was a fraud from the beginning, and it's not. What's so strange about that is a federal judge said she was not culpable for anything. So if it's so clearly a fraud, how do you square that? How do you square the notion that, look, we've seen this movie before. It's nothing novel. The whole thing's a scam. She knew it. A federal judge says she's fine. I can't speculate about why Judge Rodriguez made the first call that he made, but he didn't need new evidence, and he didn't take new evidence. It wasn't necessary. Which is remarkable, right, because he's looking at the same body of evidence, and it comes out exactly opposite. I think I'm asking you to speculate. I mean, it's a riddle to me. What's your take on it? I mean, you may be wrong, you may be right, but what happened? Hard to say. Factually complex cases are a lot of work. Okay. Well, all right. That was diplomatic. Thank you. Thank you. Mr. Ludwig, your rebuttal? Yes, Your Honor. There is nothing in the record before April 23rd. And in terms of April 23rd, the flag is there may be some unpaid contributions. But the Secretary has always said unpaid contributions aren't the issue here. The issue are the planned assets. Why don't you go right at her assertion that your client is responsible because it was your client's job to have safeguards in place from the start, and there were no safeguards in place, and that's a foundation for liability. If you take it down, I'm sure Ms. Boves said it better than I did, but I take that to be her argument. What's the response to she's responsible because the safeguards weren't there? The response is that she needs to be omniscient. And where is the proof that had there been safeguards, there would have caused any loss of planned assets? Well, her argument is if you read the agreement, you would know that there's a scam, and then that would lead to action. Well, that's absurd because Cynthia Holloway is a signatory to a collective bargaining agreement. She signs it on behalf of Employers Depot, and then the rates are set, and then the trustees are responsible for setting the contributions. All those monies are check one monies. There's no dispute about the check monies. The penalty imposed on her is solely for check two. It's check two, $3 million through September 2002, and then another $1.7 million after. She is no longer a trustee. And for there to be an expectation that on April 23rd, that just because there's a change in claims administrator, that immediately she would know that there's something amiss and something afoot is an expectation that's not supported. And then to hold her, as this court seems to note, to hold her responsible then for the entire loss. We're not noting anything. We're asking questions. Yes. And that's all. Okay. Thank you. Well, we've got your response. Thanks very much, Mr. Ludwig, Ms. Golden, and Ms. Volk. We've got the matter under advisement. Appreciate your arguments in the briefing, and we will go ahead and call it.